Our next case is Daicel Corporation v. Celanese International, 2018-2130, Mr. Murphy. Good morning. I'll get a cup of water first before I walk up. Well, that's important. You're a brave man. I never let water near my stuff. May it please the court, in our view there's three issues I'd like to discuss today. The first one is a legal issue regarding anticipation. It's fully briefed. Second one is evidentiary or factual issues related to anticipation. And the third one is obviousness. And starting with the first issue, the issue is whether the specific subject matter in a prior art reference that's being relied on for anticipation must be disclosed and enabled. In this case, the specific predicted methyl acetate and water concentrations that are disclosed in the PAT reference. It's not undisputed they're disclosed. The question is, are they enabled? You argue that Claim 5 can't be obvious over PAT because PAT is only prior art for what it teaches and enables. Even if we assume that it's not enabled under 102, how is that relevant to our 103 analysis? For Claim 5? Well, if something's not there relying on, the petitioner relied on the tables for teaching certain limitations. And they relied on other prior art or another argument of routine optimization to get the concentration of the catalyst, I believe, is what Claim 5 is. So that doesn't cure the defects of what's wrong with PAT, with the PAT reference. If PAT doesn't enable the subject matter, those two limitations, there's nothing in routine optimization that would get you to the concentrations recited in Claim 5. Wasn't PAT based on actual data, evidence, experimentation? So PAT was based on a semi-empirical simulator. Nobody knows what was in that semi-empirical simulator except for Celanese. They didn't identify it by trademark, by how it operates. It's just sort of a naked statement, three words, semi-empirical simulator. Well, you want to sustain a patent based on a very old patent, based on concentrations which are recited in another reference on essentially the same process, and I repeat, with the same concentrations of compounds, reactive materials, methyl acetate and water. I'm sorry, could you repeat the question again? This is an old process. It's a very old process. Okay. The old process is combining methanol with carbon monoxide, and you've got a flash evaporation step, and you're focusing on the concentrations of methyl acetate and water, which are in a reference. There's nothing really new. Well, there is something new. First of all, the process in a very general sense is what, maybe 30 years old. We agree to that in a very general sense, but there are improvements made constantly in this field. And the reference being relied on was a relatively new reference, not filed that much before the patented issue. And the reference was just a prediction. It was based on a semi-empirical simulator. There's no testimony from, there's no proof as to what that simulator was. The only evidence as to what that simulator was came from our witness, because he tried to figure it out, and he was very knowledgeable in computer simulation. And what he did was he took the process or the simulator that was most well-known in the industry and most widely used, and he said, I'm going to try to figure out how they got these numbers. But what is different in the reference from what is claimed? You mean different in terms of what they actually did? What is different in terms of what is claimed? You're questioning whether the enablement of the reference that led to that disclosure, these are actual data. So the data is not actual data in the reference. It's predicted data, 100%, not disputed. It's predicted data. There are witnesses I can point to in their petition. The petitioner admitted that the data in tables one through four, which are really the tables at issue, but really all the tables, was predicted data, predicted results, predicted data. So that data was predicted. Our witness came in and said why the prediction was wrong, unreliable, and not enabled. You can't reproduce that data without undue experimentation, if at all. It may be impossible, extremely difficult. So you're looking at data that may be on its face. You're looking at a patent or a reference on its face. That looks like a pretty good reference. But all the evidence as to how good it really is was submitted by our witnesses, Bizet and Rockstraw, and all the evidence, when you're looking at the critical data points, the concentration of water and the concentration of methyl acetate, those data points were generated. They were predicted, and they were predicted using a faulty semi-empirical simulator. But aside from the point you're raising, do they constitute a 102 disclosure? No, because they're not enabled. Otherwise, they would be a 102 disclosure. Otherwise, for claim one, it would be a 102 disclosure if it was enabled. All the evidence basically submitted by the patent owner is that the predictions were improper, they were unreliable, and they were not enabled because it wasn't even sure if it could ever be reproduced in real life. You can't just put something out there and then block everybody else who has a real invention later. Say, hey, I think this is going to work, especially when the evidence shows it's a faulty prediction. Okay. Turning to the case law, I think it's pretty well briefed, but in our view, and especially we summarize the case law, I believe, in our reply brief. In our view, the case law says you have to look at the disclosure being relied on for anticipation, and that disclosure has to be enabled. Speaking of the law, on page 42 of the blue brief, you ask us to consider our lead compound analysis to avoid the use of improper hindsight. As you note, the lead compound analysis applies to new chemical compounds. Right, right. The 843 patent discloses a process from producing acetic acid. How's the lead compound analysis? The lead compound analysis doesn't directly apply. I agree with that. I think the principle behind it is that when you're trying to get a patent, when you're trying to advance the art, you look at what's best and what's good. And so in our obviousness context, and our witnesses testified, and the arguments were that Pat, the reference at issue, consistently points to the best tables as being tables 6 and 7. That was argued over and over, and it was never contradicted by the petitioner. So when you step back and you try to avoid hindsight, you need to look at what is best in the prior art and then try to improve on it. Why would you take the poor, quote, or the less desirable tables of 1 to 4, and then try to put a certain nickel alloy, for example, in the flasher? If you want to make a better process, you start with tables 6 and 7. That's basically our argument. But yes, the lead compound analysis doesn't directly apply, but we believe it's the principle behind it that helps to avoid hindsight, which we believe is present here. It seems to me that your argument is that enablement means that a skilled artisan has to be able to recreate everything. It has to be able – yes, our argument is that a person of ordinary skill in the art – Otherwise, enablement means to practice, not to recreate. We have to practice what's disclosed. So you start, in our view – If you have the simulation tables, and that's 1 through 4, and they show the composition of the flasher stream and the concentration data, they expressly disclose the claim ranges of temperature and pressure, and the claim concentrations of methyl acetate and water. That's what the table's disclosed. Why couldn't a skilled artisan practice what's disclosed? In the tables of PAT? Because the tables of PAT are predicting that something's going to happen, and that doesn't happen when you follow those – when you follow the teachings of the PAT. PATs is if you – They're simulation tables. They're predictive in nature. Right. But they give you the data points by which to recreate or to practice that simulation table. You mean reproduce in real life? Yes, your argument, recreate. Right, right, recreate, right. It has to enable – But our law requires only that you be able to practice. Practice the disclosure. What's disclosed? You practice the disclosure being relied on for anticipation. The disclosure being relied on for anticipation, and it was all through the petition, and it's been all along. The disclosure relied on is those data points. It's sort of like if you have a big, broad claim to a bunch of chemical compounds, and you teach how to make some of them, but you don't teach how – and somebody comes along later, and they say, we found this great compound in here. It's not disclosed in the patent. That's quite a different story. Okay. Here you have a process consisting of methanol plus carbon monoxide to produce acetic acid. You've got all the reaction conditions, and Pat discloses the concentration of methyl acetate in water from the same process? And that's not enabled? No, it's not enabled because you can't get to those data points. In order to get to those data points, you have to – you either have to have a really good, really strong disclosure that tells exactly what to do, and you have to – you have a prediction that gets you there. Part of our testimony to our witnesses was that in any of these processes, both of our witnesses testified to this, that in order – if you're a person of ordinary skill in the art, and you see a simulation, you say, oh, that's interesting. I wonder whether it's going to work. So then you dig down into it. You shouldn't be able to just throw a prediction out there and assume it's going to prevent somebody else from getting a patent later when your prediction's wrong. If the prediction wasn't flawed, or if the process had been described in full detail on how to do it, it would be a totally different case. Well, you're into your rebuttal time. Why don't we hear from the other side? We'll give you three minutes rebuttal.  Mr. Cohn, Mr. Chase. May it please the Court. DICEL concedes that Pat discloses what would be anticipatory disclosures, four separate sets of anticipatory concentration data, and challenges only the Board's factual findings that a skilled artisan would have found Pat's disclosures to be reliable. Substantial evidence supports the Board's findings on reliability, and it's for three primary reasons. First, the Board credited Dr. Haynes' testimony that the skilled artisan would understand the term semi-empirical simulation to mean that it was based at least in part on actual data. Actual data went in to inform the simulation that was performed. Is that because that was well known in the art at the time? That's correct, Your Honor. That's another point that Dr. Haynes raised in his testimony. Incremental improvements are made in the field to this very old, mature process, and the way they're customarily done is that someone runs a simulation so that they don't have to tweak it on the ground in an actual plant. And then they implement those simulation data or the computer modeling data in an actual facility, and they're readily able to do so because that's what's customarily done. Dr. Haynes additionally testified here that in addition to being based on actual data, the data were what you would expect to see. And he based this in part on references he cited and in part on his 20-plus years of experience in the acetic acid field. He said that a skilled artisan would understand the flasher to be, quote, representative of actual real-world streams. And that's appendix page 2437 from his declaration. The third point that he made was the one that I just mentioned, that it was commonplace and routine. And based on all of that… Almost high school science fair routine. Perhaps, Your Honor. There's complicated chemistry involved, but at the end of the day, this is a very mature process, and people know how to make changes here, implement them. And that's exactly what Dr. Haynes said. Just one brief point on the legal standard. Judge Reyna, you asked about what PAT needs to do to enable in terms of its data points, and I think that you were correct. PAT gives you the data to use, and what you use those data to do is to modify the process on the ground. You don't have to achieve a data table that has the same exact points as PAT, and that's exactly what the board found. The board said you don't have to reproduce PAT with 100% accuracy. Instead, you need only to have a skilled artisan be able to take PAT's disclosures and practice the claims, which, of course, are broad ranges of concentration. Practice the claims of the patent. You're not looking at practicing the prior art. That's exactly right, Your Honor. Enablement is viewed as whether the disclosure enables you to practice a claim. Here, the claim is the claims of the patent in suit, and the testimony from Dr. Haynes that the board relied on and credited was that a skilled artisan could take PAT reference, could look at those anticipatory data sets, the four tables, and could apply that to a real-world process without undue experimentation. The process being methanol plus CO and ending up not only with acetic acid, but with a particular concentration of methyl acetate and water in this mix. That's exactly right, Your Honor. And what's important about those concentrations? Those aren't intended products of reaction. No, they're not. Acetic acid is the intended product. The concentration of methyl acetate and water affect various things in the system, including removal of impurities. And so when you carry these components down into the system, they have an effect. But it has an effect on reaction and also on removal of impurities. And so they're desirable ranges. Are they almost incidental byproducts of the claimed reaction? I'm not sure if they're byproducts, Your Honor, but certainly what you get out of the flasher reflects what you put in and the conditions. So the flasher liquid stream would resolve. But your purpose isn't to get methyl acetate and water. That's exactly right. Or any particular concentration of it. That's correct, Your Honor. Ultimately, this is all in service of producing acetic acid, which is the ultimate product that you're trying to produce at a high level of purity. I'm happy to answer questions about the obviousness questions if the court has any questions. I believe, Judge Wallach, you had it right that even if it were not enabling, which we believe it is, that wouldn't be relevant for the obviousness inquiry. And so I think that that pretty much resolves the question on Claim 5. But if the court has additional questions, I'd be happy to take them. Otherwise, we would ask the court to affirm based on the substantial evidence. That's Dr. Haynes' testimony and the Board's thorough consideration of the prior art. Thank you, Counsel. We'll hear more from you in a few moments. Mr. Murphy has some rebuttal time. Three minutes. So one of the questions that just came up was, are the methyl acetate and water important? And, yes, they're very important. In fact, especially controlling water. Water is a very important part of the process. And there are – over the years, there have been high water processes, low water processes. And you – this particular claim is on the low water end of the process. And there's reasons – there's technical reasons to do that. So these aren't just incidental impurities. They're critical components that are intentionally part of the process and controlled to get good results. They also affect the equilibrium in the system. One of the other products that's in the process stream, and there's a lot of discussion about it, is an iodide species, methyl iodide. And that turns into an acid – iodide in an acid form. And that corrodes the reactors, corrodes whatever vessel it happens to be in. And one of the things that our client, Dicell, found was that by controlling all of these parameters, water and methyl acetate, you can get – you can actually keep the hydrogen iodide concentration very low and use a nickel alloy material. And we get to claims 11 and 13. The – those are only rejected for obviousness. And there's a section in our brief where we talk about – Pat talks about the conditions being less corrosive downstream. But that's far downstream from where the flasher is. Our client found out and claimed in claims 11 and 13 that they can use a nickel alloy in the flasher. The main rebuttal to that is, oh, people have been using nickel alloy. It's kind of known that you can use it in the Monsanto process. Well, there's so many variations of the Monsanto process, hundreds, thousands possibly of patents, articles. You can't just look at patents and say, oh, use nickel alloy in the flasher. There's no suggestion. If you look at the documentary evidence that was cited by Dicell, those are strongly pointing towards a more corrosion-resistant material in the flasher. It's right in the references. It's cited in the briefs. And the response by Celanese to that is, ah, you know, nickel alloy is out there. People have been using it in different vessels for the – over the years. And we think that's clearly hindsight also. Well, thank you, counsel. We will take the case under advisement.